21 F.3d 421
 145 L.R.R.M. (BNA) 2768
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
BAXTER HEALTHCARE CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
BAXTER HEALTHCARE CORPORATION, Respondent.
 Nos. 93-1589, 93-1755.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 9, 1993.
Decided March 11, 1994.
 
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board. (11-CA-12772, 11-CA-12980, 11-CA-13039, 11-CA-1328-3, 11-CA-13362-1-2-3, 11-CA-13566-3-4)
 James Hamilton Stewart, III, Ogletree, Deakins, Nash, Smoak & Stewart (R. Allison Phinney, Ogletree, Deakins, Nash, Smoak & Stewart, on brief), Greenville, SC, for petitioner.
 David A. Seid, National Labor Relators Board (Jerry M. Hunter, General Counsel, Yvonne T. Dixon, Acting Deputy Gen. Counsel, Nicholas E. Karatinos, Acting Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Frederic Havard, Supervisory Attorney, National Labor Relations Board, on brief), Washington, D.C., for respondent.
 N.L.R.B.
 ENFORCEMENT GRANTED IN PART AND DENIED IN PART.
 Before ERVIN, Chief Judge, and WILKINS and NIEMEYER, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Baxter Healthcare Corporation petitioned for review of a decision and order of the National Labor Relations Board finding that Baxter violated Sec. 8(a)(3) of the National Labor Relations Act, 29 U.S.C.A. Sec. 158(a)(3) (West 1973), by discharging employees John Jimeson, Lois Jimeson, and Ella Mae Bailey. The Board filed a crossapplication for enforcement of the decision and order. We hold that the Board's order cannot stand with respect to John Jimeson because substantial evidence does not support the Board's finding that he was terminated in violation of Sec. 8(a)(3). However, because substantial evidence supports the decision of the Board with respect to Lois Jimeson and Ella Mae Bailey, we enforce its order in part.
 
 I.
 
 2
 Baxter employs approximately 2,700 people at its plant in Marion, North Carolina, where it manufactures intravenous solutions and containers (IV bags). In 1988, Teamsters Local No. 61 (the Union) filed a petition with the National Labor Relations Board for a union representation election at the plant, and an election was scheduled for October 26 and 27, 1988. During the course of the campaign, it was commonly known that Bailey and the Jimesons supported the Union. Despite a vigorous campaign, the Union lost the election. The Union was again unsuccessful in a second election held in January 1989.
 
 
 3
 Approximately three months later, a written note claiming that an IV bag produced at the plant had been poisoned was found on the premises. The note threatened that additional IV bags would be poisoned if management did not give the employees an increase in pay. Baxter officials took the threat seriously, contacting the Food and Drug Administration, the Federal Bureau of Investigation, and local law enforcement officials. The plant was closed for two days while officials conducted an investigation and quarantined all existing IV bags for future disposal. The disposal of the IV bags and the added security measures suggested by the FBI cost Baxter over $1.4 million.
 
 
 4
 As an additional security measure, the FBI recommended that Baxter require its employees to be fingerprinted. In May 1989, the plant manager, Mike Gatling, notified all employees that Baxter was adopting a fingerprinting program. During employee meetings in August and September, the employees were told that the fingerprinting process would begin in October. On October 2, 1989, notices were posted stating that fingerprinting would begin on October 13. A memorandum was also distributed to supervisors on October 11 to be read to employees, stating that fingerprinting would be a "condition of their employment."
 
 A.
 
 5
 While fingerprinting was taking place on Friday, October 13, Mr. Jimeson informed the safety manager that he wanted to consult with his attorney before allowing his fingerprints to be taken. He was then summoned by the human resources manager, Ron Houser, to discuss his refusal to be fingerprinted. It is not disputed that several times during this conversation, Mr. Jimeson refused to be fingerprinted, responding to each request by stating that he wanted to consult with his attorney. Mr. Jimeson was given the opportunity to telephone his attorney, but reported to Houser that his attorney was unavailable. Afterward, Houser advised Mr. Jimeson that if he did not agree to be fingerprinted he would be suspended. Mr. Jimeson again refused. Houser then informed him that he was suspended pending an investigation that could lead to his discharge. Shortly thereafter, Houser and Gatling contacted a member of the corporate Termination Review Board (TRB) and recommended that Mr. Jimeson be terminated.
 
 
 6
 The following Monday, Mr. Jimeson consulted his attorney and was advised that Baxter had the right to require him to submit to fingerprinting. Later that same day, Mr. Jimeson informed Houser that he now agreed to be fingerprinted.
 
 
 7
 The next morning, when the TRB met to consider Mr. Jimeson's termination, Houser informed the TRB of Mr. Jimeson's subsequent willingness to be fingerprinted. The TRB concluded that the refusal to obey the order of a supervisor constituted conduct warranting discharge, that the suspension period was solely for the purpose of investigation, that the only conduct properly considered was the conduct leading up to and constituting the employment violation, and that the suspension period was not intended to allow employees to rethink their actions and recant. Therefore, it agreed that the termination of Mr. Jimeson was proper. Mr. Jimeson was contacted and informed of the decision. The reason given for his termination was insubordination, specifically, "Employee refused to comply with employment requirements (fingerprinting)."
 
 B.
 
 8
 In November 1988, Mrs. Jimeson, who worked in the filling department, developed pain and swelling in her left wrist and arm. After an examination by her physician in mid-November, she was removed from her regular position and placed on "light duty." When she continued to experience problems with her wrist, she consulted an orthopedic specialist. He recommended that Mrs. Jimeson return to her regular work wearing a wrist brace. Because she had difficulty performing her job while wearing the brace, Mrs. Jimeson was allowed to take a leave of absence, receiving short-term disability benefits during her absence.
 
 
 9
 While on leave, Mrs. Jimeson was periodically examined and treated by another orthopedist who diagnosed her condition as carpal tunnel syndrome and indicated that she could not return to work prior to May 26, 1989. During the last few weeks of May, Mrs. Jimeson, at the request of her mother-in-law, began assisting at a hardware store owned by her father-in-law. On one occasion, a Baxter supervisor came into the store and observed Mrs. Jimeson standing behind the counter. He reported this to Houser.
 
 
 10
 Mrs. Jimeson returned to work on June 1, 1989. Five days later, she was summoned to Houser's office. Houser informed her that she had been seen working at the hardware store while she was on paid disability leave. Mrs. Jimeson responded that she had been temporarily "helping out" her in-laws without compensation. She requested that Houser contact her in-laws for confirmation.*
 
 
 11
 Without further investigation, Houser and Gatling decided that Mrs. Jimeson should be terminated. The TRB approved the discharge, and on June 12, 1989, Houser gave Mrs. Jimeson her termination notice. The notice stated: "Discharged for violation of Company Rule No. 2, 'Falsification of personnel records or other records.' Employee was working another job while on sick leave receiving pay from our Company."
 
 C.
 
 12
 On February 7, 1989, Mrs. Bailey, who also worked in the filling department, was granted a leave of absence to have corrective surgery on her feet. The surgery was performed on her right foot on February 28, and after a period of recuperation the same operation was performed on her left foot. Physical activities, including standing and walking, were restricted for a period of approximately four weeks following each surgery. Mrs. Bailey's recovery was monitored by a physician who periodically submitted "Attending Physician Statements" to Baxter. On May 15, Mrs. Bailey also submitted a "Claimant's Intermediate Statement" advising Baxter that she would be able to return to work on May 28, 1989. One of the questions on the form asked: "Are you now engaged in other gainful employment?" Mrs. Bailey checked the box marked "No." On May 30, Mrs. Bailey's physician extended her disability until June 12, 1989.
 
 
 13
 To supplement her income during her leave of absence, Mrs. Bailey unsuccessfully attempted to sell various personal household items at a local flea market. During a visit to the same flea market, a Baxter supervisor observed Mrs. Bailey behind a booth where she was offering the items for sale. The supervisor reported Mrs. Bailey's activities to Houser, and when Mrs. Bailey returned to work on June 12, Houser informed her that she had been observed selling items at a flea market while on paid disability leave. Mrs. Bailey responded that she needed the money and that the items were only personal items she had cleaned and decorated for resale. Houser replied that it was against company policy for an employee to be on sick leave and at the same time "mak[e] money."
 
 
 14
 Houser and Gatling concluded that Mrs. Bailey's actions warranted termination. The TRB approved the dismissal, and on June 14, 1989, Mrs. Bailey was informed of the decision. Baxter's "Employee Separation Review Report" stated the reason for her discharge as: "Violation of Company Rule # 2. 'Falsification of personnel or other records.' Ella Bailey was working another job while on sick leave and receiving sick pay from our Company."
 
 D.
 
 15
 The Union filed unfair labor practice charges against Baxter on behalf of the three employees. After an evidentiary hearing, the administrative law judge (ALJ) concluded that neither Mrs. Jimeson nor Mrs. Bailey had violated a nondiscriminatory interpretation of Baxter's rules and that the restrictive interpretations imposed by Baxter were motivated by a desire to remove union activists in violation of Sec. 8(a)(3). The ALJ also found that Mr. Jimeson had never actually refused to be fingerprinted, but simply had requested additional time to consult his attorney concerning the legality of the fingerprinting requirement. For this reason, the ALJ concluded that there was no reasonable basis for Mr. Jimeson's discharge and that, therefore, his termination violated Sec. 8(a)(3). The ALJ then ordered the reinstatement of the three employees with back pay. Baxter timely filed exceptions to the decision and order.
 
 
 16
 The National Labor Relations Board unanimously agreed that Mrs. Jimeson and Mrs. Bailey were terminated in violation of Sec. 8(a)(3), noting that Baxter had deviated from its customary policy of investigating reported instances of leave violations by failing to directly contact Mrs. Jimeson's in-laws to verify her employment status, that Baxter had not previously applied its rules regarding leaves of absence in the manner they were applied against Mrs. Jimeson and Mrs. Bailey, and that Baxter had given a shifting account of the reasons for and circumstances surrounding their discharge.
 
 
 17
 The Board also voted, two to one, to order the reinstatement of Mr. Jimeson. The majority concluded that, while Mr. Jimeson's refusal to be fingerprinted constituted a ground for discharge, Baxter would have, in the absence of Mr. Jimeson's union activities, considered his subsequent willingness to be fingerprinted a mitigating circumstance warranting the imposition of a lesser sanction.
 
 II.
 
 18
 Section 8(a)(3) of the National Labor Relations Act prohibits discrimination by employers against employees with regard to tenure of employment for the purpose of discouraging membership in a labor organization. 29 U.S.C.A. Sec. 158(a)(3). Thus, an employer violates Sec. 8(a)(3) of the Act by discharging employees because of their union activities. NLRB v. Transportation Management Co., 462 U.S. 393, 397-98 (1983). To establish a discriminatory discharge under the Act, general counsel for the Board bears the initial burden of proving that the employer's decision to terminate the employee was " 'motivated by anti-union considerations.' " NLRB v. Low Kit Min. Co., 3 F.3d 720, 728 (4th Cir.1993) (quoting NLRB v. General Wood Preserving, 905 F.2d 803, 818 (4th Cir.), cert. denied, 498 U.S. 1016 (1990)). Upon such a showing, the burden shifts to the employer to prove that the employee would have been discharged in the absence of the employer's anti-union motivations. Id. A finding by the Board that an employee has been discharged in violation of Sec. 8(a)(3) is conclusive if supported by substantial evidence on the record as a whole. 29 U.S.C.A. Sec. 160(e)-(f) (West 1973). Therefore, if we conclude that the factual findings of the Board regarding the employees' termination " 'have substantial support in the record as a whole, our inquiry ends and its order must be enforced even though we might have reached a different result had we heard the evidence in the first place.' " NLRB v. Frigid Storage, Inc., 934 F.2d 506, 509 (4th Cir.1991) (quoting NLRB v. Nueva Eng'g, Inc., 761 F.2d 961, 965 (4th Cir.1985)).
 
 
 19
 Baxter asserts that the evidence clearly demonstrates it discharged the three employees solely because of their violations of its disciplinary rules. For this reason, Baxter contends substantial evidence does not support the finding of the Board that the employees' union activities were a motivating factor in their discharge. Additionally, Baxter argues that, even if there is sufficient evidence to establish that antiunion considerations were a factor in the employees' discharge, substantial evidence does not support the conclusion of the Board that the employees would not have been discharged in the absence of their union activities. We turn first to the terminations of Mrs. Jimeson and Mrs. Bailey. We then address the discharge of Mr. Jimeson.
 
 A.
 
 20
 With respect to the terminations of Mrs. Jimeson and Mrs. Bailey, the evidence contained in the record establishes the following. First, Baxter's employment policy provides that "[l]eaves of absence shall not be used to engage in other employment." The term employment "implies work for which one has been engaged and is being paid by an employer." Webster's Ninth New Collegiate Dictionary, 1359 (1990). And, the testimony of Baxter officials demonstrates a practice of considering compensation as a determinative factor in the enforcement of the prohibition against engaging in other employment while on a leave of absence. However, neither Mrs. Jimeson nor Mrs. Bailey were being paid by another employer while they were on disability leave. Second, Baxter deviated from its customary policy of investigating reported leave violations when it failed to contact the hardware store to confirm Mrs. Jimeson's explanation of her activities at the store. Finally, Baxter gave a shifting account of the reasons for and circumstances surrounding the employees' discharge. Initially, Baxter charged that both Mrs. Jimeson and Mrs. Bailey had submitted falsified documents concerning the severity of their medical disabilities and their continuing need for medical leave; but, Houser conceded before the ALJ that Mrs. Jimeson had not falsified any documents, and Baxter dropped its contention that Mrs. Bailey could have performed work at Baxter during her disability. This evidence provides substantial support for the findings of the Board that anti-union considerations were a motivating factor in Baxter's termination of Mrs. Jimeson and Mrs. Bailey and that they would not have been terminated absent Baxter's improper motivation. Therefore, the order of the Board must be enforced with regard to Mrs. Jimeson and Mrs. Bailey.
 
 B.
 
 21
 Substantial evidence does not support the Board's finding that union animus was a motivating factor in Mr. Jimeson's discharge. The only evidence of union animus offered in connection with the discharge of Mr. Jimeson is the allegedly draconian application of Baxter's disciplinary rules. These rules provide that discharge is appropriate upon the "[r]efusal or failure to obey orders or do assignments given by a supervisor or company representative." Thus, Mr. Jimeson's repeated refusal to be fingerprinted violated a rule for which discharge was appropriate.
 
 
 22
 Nevertheless, the Board concluded that Baxter's failure to consider Mr. Jimeson's subsequent willingness to be fingerprinted as a mitigating circumstance warranting leniency evinced union animus. Baxter's rules provide that "in assessing disciplinary action, consideration will be given to the possibility of mitigating or other aggravating circumstances." The record reflects, however, that in determining what disciplinary action should be taken both Houser and the TRB considered Mr. Jimeson's subsequent willingness to be fingerprinted. They simply concluded that his subsequent conduct was irrelevant in this instance. There is no evidence that Baxter had previously considered such post-violation conduct as a mitigating circumstance, nor was other evidence presented indicating that Baxter misapplied its own rule. Moreover, Mr. Jimeson had knowledge of the impending fingerprinting requirement for more than four months prior to its implementation. This fact weighs against considering his subsequent willingness to be fingerprinted as a mitigating circumstance. Consequently, we do not find substantial evidence in the record to support the Board's conclusion that anti-union considerations were a motivating factor in Mr. Jimeson's termination.
 
 III.
 
 23
 Accordingly, enforcement of the portion of the order of the National Labor Relations Board pertaining to Mrs. Jimeson and Mrs. Bailey is granted, and enforcement of the portion of the order applying to Mr. Jimeson is denied.
 
 
 
 *
 Mrs. Jimeson's testimony that she performed only light tasks such as dusting shelves and pricing items is undisputed